**E-FILED**
Thursday, 18 January, 2007  12:00:29 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 04-2209** |
| **v.** | ) | |
| | ) | |
| **FEDERAL EXPRESS CORPORATION,** | ) | |
| | ) | **JUDGE BAKER** |
| **Defendant.** | ) | |

## TRIAL BRIEF OF PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

In this case, EEOC alleges that Federal Express Corporation ("FedEx") subjected David Marcotte ("Marcotte") and Robert Kerouac ("Kerouac") to sexual harassment by a male coworker and that the company retaliated against Marcotte when he complained of the harassment.

The evidence at trial will show that Marcotte was repeatedly and severely sexually harassed for a period of years at his job in Kankakee, that FedEx management was well aware of it, and that FedEx management was completely ineffectual in stopping the harassment. The evidence will also show that Marcotte was not the first or only male employee to be harassed by this same coworker. Indeed, Kerouac and others were also sexually harassed by him. Not only did FedEx not stop the harassment, the evidence shows that FedEx management retaliated against Marcotte when he complained about the harassment.

I.      **FEDEX IS LIABLE FOR THE SEXUAL HARASSMENT OF DAVID MARCOTTE AND ROBERT KEROUAC**

      A.      **Marcotte/Kerouac Were Harassed Because of Their Sex**

To prove same-sex sexual harassment, a plaintiff must show that s/he was harassed "because of [his/her] sex." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75 (1998). "So long as the plaintiff demonstrates in some manner that he would not have been treated in the same way had he been a woman, he has proven sex discrimination." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). In this case, there is overwhelming evidence that McGill harassed male couriers because he was motivated by a sexual desire for men, and that McGill treated men and women differently.

Though McGill denies being homosexual (explaining that his religious beliefs include a belief that homosexuality is sinful), many of his coworkers believe him to be homosexual, and the evidence suggests that he was indeed motivated by a sexual desire for men. The evidence will show that McGill touched Marcotte constantly: he rubbed Marcotte's shoulders, rubbed his rear end, slapped his rear end, ground his genitals into Marcotte's rear end as he stood behind him; bumped into him; reached out his hand and rubbed his leg or his rear end; and goosed him with his finger or with a clipboard. McGill also made sexual comments to Marcotte. McGill constantly spoke to Marcotte about masturbating and asked him if he liked to do "missile exercises" alone or with his dog. He once showed Marcotte playing cards depicting men engaged in various sexual acts and asked Marcotte which positions he liked. McGill repeatedly told Marcotte he wanted to ride in the truck with him so he could rub Marcotte's shoulders and rub his rear end. McGill once invited himself to Marcotte's hotel room where he was staying while taking a training class and, when Marcotte refused to allow him to come, McGill told Marcotte when he next saw him that Marcotte should have let him come so he could do the

things to him that he was going to do to him anyway.  McGill repeatedly told Marcotte he wanted to bend him over and "drill him in the ass" and that he wanted to surprise him "with something big and hard."  McGill regularly referred to Marcotte as his "Big Boy," and his "Blonde Bombshell."

Bob Kerouac did not escape McGill's notice.  McGill regularly rubbed Kerouac's back and shoulders and touched him on his inner thigh on three separate occasions, looking to Kerouac for a reaction.  Kerouac also witnessed some of McGill's actions toward Marcotte, including one time when McGill sat next to Marcotte, put his hand on his leg, and told him he wanted to ride him.  The sexual harassment of Marcotte as witnessed by Kerouac is relevant to Kerouac's claim of sexual harassment.  Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir. 1999).

McGill sexually harassed other men at IKK.  He touched Jay Pollock, another male courier, on his upper torso in a way Pollock believed to be inappropriate and showed him playing cards depicting naked men.  McGill talked to Mike Gurley, another courier, about pornography.  Gurley believed that McGill wanted a sexual relationship with him.  He often picked lint off of Gurley's shirt.  McGill also gave Gurley gifts of candy and baked goods and sent him flirtatious emails suggesting to Gurley that McGill wanted a romantic relationship with him.

McGill's obvious sexual and romantic interest in Marcotte and other male couriers certainly suggests that McGill harassed Marcotte and Kerouac because they are men. The finder of fact, evaluating this harassment in context, will likely conclude from the "relentlessly sexual tenor of the harassment," that Marcotte and Kerouac were harassed because they are men.  Shepherd v. Slater Steels Corp., 168 F.3d 998, 1011 (7th Cir. 1999).

Moreover, McGill did not treat women similarly to how he treated men.  While McGill claims that he rubbed the shoulders of female couriers as well as male couriers, there is no

3

evidence in the record that he told any female courier he wanted to "ride" her or "drill" her, that he groped the buttocks of any female courier, or repeatedly touched any woman on the inner thigh, left her candy or sent her plaintive email cards.  This is not a case about an "equal opportunity back-rubber."

**B.     McGill's Sexual Harassment Was Severe and Pervasive**

The evidence shows that McGill's harassment of Marcotte began on December 1, 1999, when McGill put his arm around Marcotte's shoulders and told him to "Bend over, Big Boy," and his groping and graphic comments did not abate until nearly *four years later* when McGill was fired in November 2003 for deliberately injuring Marcotte.  McGill sexually harassed Marcotte every time he worked with him, which was almost every day during the one-hour morning sort and for an hour or more each evening.  McGill repeatedly rubbed Kerouac's back and shoulders and inner thigh.  Here, McGill's harassment was clearly sexual, nearly constant, and often extreme.  The sexual harassment that Marcotte and Kerouac were subjected to in this case was severe and pervasive.

**C.     FedEx Was Negligent in its Response to Kerouac and Marcotte's Complaints of Harassment**

**1.     FedEx was aware of McGill's sexual harassment of male employees since at least December 1999 and did nothing to address the problem for three and a half years.**

With respect to sexual harassment by co-workers, the Seventh Circuit has recognized that an employer may be held liable where "it knew (or should have known) about the problem." *Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1009 (7th Cir.1998).  Here, FedEx knew about the problem because the harassment was pervasive, *Wilson v. Chrysler Corp.,* 172 F.3d 500, 509 (7th Cir.1999) (citing *Young v. Bayer Corp.,* 123 F.3d 672, 674 (7th Cir.1997)); *Zimmerman v. Cook Co. Sheriff's Dept.,* 96 F.3d 1017, 1018-19 (7th Cir. 1996), and because

male employees complained to O'Sullivan repeatedly over a period of years that McGill was harassing them. The record shows that Marcotte began complaining to O'Sullivan about McGill as early as 1999 and complained to her at least ten times. Kerouac complained to O'Sullivan about McGill's harassment three times. Gurley and Pollock both complained repeatedly to O'Sullivan about McGill. In each case, O'Sullivan "blew off" the complaints, shrugged her shoulders, laughed, or said there was nothing she could do about it, though she admitted in a conversation with Marcotte in September 2001 that his complaints about McGill were not the first she had heard; he had done the same kind of thing to other couriers.

Moreover, the testimony will show that Marcotte complained to O'Sullivan explicitly about McGill's sexual comments, such as that McGill told him he wanted Marcotte to bend over so he could "drill [him] in the ass," and the groping and rubbing. Each time Marcotte complained, he told her he did not like what McGill was doing and that she had to make him stop. Others heard Marcotte repeatedly complaining to O'Sullivan about McGill. Kerouac also complained to O'Sullivan that McGill was touching him on his shoulders, back, and inner thigh and told O'Sullivan to keep McGill away from him.

### 2. Marcotte and Kerouac followed FedEx Policy in Reporting the Harassment; FedEx did not.

Under FedEx's policy, an employee who witnesses or is subjected to sexual harassment is instructed to "immediately report the incident to your manager, your personnel representative, and/or the Employee Relations Department. They are obligated to act upon any form of notification as a formal complaint. Federal Express will investigate your complaint and take the necessary remedial action." O'Sullivan had an obligation to act on Marcotte's and Kerouac's complaints as soon as they were made.

But O'Sullivan did nothing until January 2003, after Marcotte had complained to

dispatch that he did not want to receive the suggestive dispatch messages from McGill any
longer. Faced with a paper trail, O'Sullivan finally acted. She called Marcotte into her office
and discussed the dispatch messages with him. Marcotte again spoke openly at the meeting
about McGill's groping and touching him. O'Sullivan told Marcotte at the meeting that the
situation was serious and it sounded like sexual harassment. O'Sullivan's response to what she
had acknowledged to be sexual harassment was to call both men into her office in February
2003, tell McGill that he has the problem and not Marcotte, and ask both men to sign a paper
alleging that they agreed to work together.

O'Sullivan's wholly inadequate response to Marcotte's complaints surprised even a
senior member of FedEx's Corporate HR department. Carleythia Anderson, a FedEx Senior
Corporate HR Advisor who reviewed the report of FedEx's internal investigation, wrote, "Is that
it?!" on the portion of the Investigation Report detailing O'Sullivan's tepid response to these
serious allegations.[1] Anderson commented that, if she had heard these allegations in February
2003 as O'Sullivan had, she would have expected O'Sullivan to begin the EEO process by
contacting the HR department. Ignoring FedEx policy, O'Sullivan did *not* forward Marcotte's
complaints to FedEx's Human Resources Department, and the harassment by McGill continued
unabated. Anderson was also troubled to learn that, in response to Marcotte's complaints of
McGill's harassment, FedEx management had suggested that Marcotte move his truck --an act
she perceived as a form of disciplining Marcotte for complaining. According to Anderson,
"normally, we don't move or discipline or – especially during an investigation – the complaining
party."

The evidence at trial will show that Marcotte, Kerouac, and other male couriers followed

---

[1] Not surprisingly, Marcotte refused to sign the document and instead wrote his own document
explaining that he refused to continue to put up with any more sexual harassment by McGill.

FedEx's policy (even those who were unaware of what the policy said)[2] by complaining to

O'Sullivan about McGill's sex harassment, and that, under the policy, O'Sullivan had an

obligation to act upon any complaint of harassment.   It is equally clear that O'Sullivan did

absolutely nothing meaningful with respect to these complaints.  FedEx did not act before

Marcotte made a written complaint in March 2003.[3]

> **3.      Even after Marcotte made a written complaint in March 2003, the Response from FedEx was Inadequate**

After Marcotte provided FedEx with a written copy of his allegations in March 2003,

after he filed a charge of discrimination with the EEOC, and three and a half years after he began

making regular complaints to O'Sullivan, FedEx finally conducted an investigation into

Marcotte's complaints.  It is apparent from everything FedEx did and failed to do from this point

on, that while FedEx did come to the belated understanding that it was obligated to investigate

Marcotte's complaints, it was unable or unwilling to stop the harassment, prevent or stop

retaliation, or to protect the complainant.

For example, FedEx made no effort during or after the investigation to separate Marcotte

from McGill; indeed, both O'Sullivan and Carrell assigned McGill to work near Marcotte, thus

---

[2] EEOC will also present evidence showing that employees at IKK were unaware of the details of FedEx's sex harassment policy, were not trained on it prior to the conclusion of the investigation into Marcotte's complaint in 2003, were unaware of who their personnel representative was, what the Employee Relations Department was, or how to contact anyone there.

[3] O'Sullivan's response to repeated complaints of severe and pervasive sexual harassment was so poor, FedEx is forced into the uncomfortable position of trying to argue that Marcotte and Kerouac somehow had a legal obligation to go outside FedEx's policy to help themselves.  Not only did Marcotte and Kerouac have no legal obligation to do so (*EEOC v. Federal Express Corp.*, No. 04-2209, 2006 WL 3512960 (C.D. Ill. Dec. 5, 2006)), but the aftermath of FedEx's internal investigation makes clear that going directly to FedEx's HR department would have been entirely futile.

providing McGill with a convenient opportunity to harass Marcotte regularly.  In addition, after the investigation, from which FedEx concluded that Marcotte had been sexually harassed and that his manager had known about it, McGill's harassment of Marcotte intensified and his managers retaliated against him.  Despite Marcotte's continuing efforts to inform FedEx about these problems, he was ignored.  For example, Marcotte reported McGill's alarming behavior to Stacy Buehner of FedEx's HR department on or about April 26, 2003 and again on or about April 28, 2003, about McGill's continued harassment, and spoke again to O'Sullivan about the problem on or about August 14, 2003.  The harassment continued.

Finally, in desperation, Marcotte spoke to Sharon Smith on or about October 1, 2003, to tell her that McGill was continuing to harass him and was throwing packages at him.  Smith, the senior member of the FedEx HR department heading the investigation into Marcotte's complaints of sexual harassment, responded by telling Marcotte that she was tired of hearing about his complaints, that the investigation was completed, the problem was solved, and he should "grow up and act like a man."

Not only was FedEx completely ineffective in stopping McGill's harassment of Marcotte, it was completely ineffective in preventing or dealing with Marcotte's managers' retaliation against him.  Marcotte repeatedly complained to FedEx's HR department about O'Sullivan's retaliation, but received no response.  As is explained in more detail below, O'Sullivan retaliated against Marcotte by cutting his hours and harassing him.  Carrell also retaliated against Marcotte, ultimately firing him for allegedly having three discipline notices in his file in a 12-month period, an infraction for which his harasser, McGill, had not been fired.

Thus, far from effectively dealing with complaints of sexual harassment (even after conducting an internal investigation three years after learning about the complaints), FedEx

could not (or would not) protect Marcotte from his harasser or from the retaliation of his managers.  The evidence will support a finding that FedEx was negligent in its response to the complaints of sexual harassment.

## II.   FEDEX RETALIATED AGAINST MARCOTTE

Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee (or job applicant) because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2410 (2006), citing 42 U.S.C. § 2000e-3(a).  Marcotte both opposed a practice forbidden by Title VII (by complaining to FedEx about sexual harassment) and participated in protected activity (by filing a charge of discrimination).

A plaintiff has two means of proving Title VII retaliation: the direct method and the indirect method.  *Kampmier v. Emeritus Corp.*, -- F.3d--, No. 06-1788, 2007 WL 6072, * 6 (7th Cir. Jan. 2, 2007).  Under the direct method of proof, a plaintiff can rely upon either direct evidence of retaliation or circumstantial evidence such that a jury can infer retaliation.  *See id.* Under the indirect method of proof, a plaintiff must show that after making a complaint of discrimination, only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner.  *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002).  The employer may defeat the claim if it can show a legitimate purpose for the action taken, and the employee is unable to rebut that evidence by showing the stated purpose is pretextual.  *Id.*

EEOC will show that FedEx retaliated against Marcotte, through both the direct and indirect methods of proof.

A.     **FedEx Cut Marcotte's Hours In Retaliation for His Sexual Harassment Complaints**

1.     **Direct Evidence of Retaliation.**

After Marcotte's March 2003 internal complaint and EEOC charge, FedEx was quick to retaliate against him.  In April 2003, O'Sullivan cut Marcotte's hours by removing him from the reload, which he had been doing for over two years prior to filing his March 2003 written complaint and EEOC charge.  FedEx claims that O'Sullivan took Marcotte off the reload because he became a full time courier, but the evidence in the record shows that O'Sullivan's explanation is false.

O'Sullivan's statements to Marcotte and his co-workers, in which she made no secret of her anger over Marcotte filing his March 2003 complaint and charge, are direct evidence of retaliation.  O'Sullivan's bold statements show that her real reason for taking Marcotte off the reload had nothing to do with his title change and everything to do with her desire to retaliate against him.  After Marcotte submitted his written complaint, O'Sullivan told Calimas Hill and Joshua Jeck that she was going to cut Marcotte's hours, but she never informed Marcotte she was going to do so.  O'Sullivan's failure to tell Marcotte that she was taking him off the reload and to give him any legitimate reason for doing so suggests that she had none.

Additionally, O'Sullivan told Hill that she was going to "get" Marcotte and that she thought that Marcotte was a liar.  O'Sullivan told Hill that she "had" Marcotte because on days that Marcotte said he complained to O'Sullivan, she was not at work.  She also told both Marcotte and Hill that she was going to retaliate against Marcotte in other ways.  O'Sullivan told Marcotte after he filed his complaint that he would not get courier route 316, which he applied for before his complaint and had been covering for over two years, and that he would not get any

10

back pay for the time he had covered route 316 but received shuttle driver/package handler pay.[4]
She also told Hill shortly after Marcotte filed his complaint that for purposes of Marcotte's
performance evaluation, she was going to treat vacation days that he took in April 2003 as sick
days, which would affect his attendance rating on his performance evaluation, which could in
turn affect his raise.  Hill did not hear O'Sullivan say that she was going to treat any other
employee's sick days as vacation days the same way.  O'Sullivan was obviously angry at
Marcotte for complaining about sexual harassment in March 2003 and exposing her
incompetence, and made clear her desire to punish him.

### 2.    Indirect Method of Proof of Retaliation

The evidence will also establish retaliation under the indirect method of proof.  EEOC
can establish a prima facie case that O'Sullivan cut Marcotte's hours in retaliation for his
complaints and that her stated reasons for doing so were pretextual.  FedEx concedes that cutting
Marcotte's hours is an adverse employment action.  The record shows that Bill Rogers, a
similarly situated employee, was treated more favorably than Marcotte.  Rogers replaced
Marcotte on the reload and continued doing the reload the remainder of the time that O'Sullivan
worked at FedEx.  During part of the time he did the reload, Rogers was a full-time, a.m. courier,
just like Marcotte, only with less seniority, and no history of complaining of sexual harassment.

O'Sullivan's explanation for why Marcotte was taken off the reload does not make sense
in light of O'Sullivan's own testimony, and furthermore, is directly contradicted by other
witnesses.  She claims that she took Marcotte off the reload because his title officially changed
from shuttle driver/package handler to courier.  The change in Marcotte's job title should be of
significance only if O'Sullivan had another package handler replace Marcotte on the reload,

---

[4] Although FedEx did give Marcotte the 316 route and some back pay for the time he was
working out of classification, this statement nonetheless shows O'Sullivan's intent to harass and
retaliate against Marcotte for his sexual harassment complaint.

since that was part of a package handler's job, or if she allowed other couriers the same opportunity as Marcotte to do the reload.  O'Sullivan claimed that Charlie Nave and Rickey Tucker, who were more senior than Marcotte, had complained to her about Marcotte getting more than fifty hours a week and that they should also have a chance to do the reload. O'Sullivan, however, did not replace Marcotte with another package handler, nor did she assign Nave, Tucker, or any other courier with more seniority than Marcotte, to the reload.  Rather, she contends that the only person assigned to do the reload on a regular basis was Jeck, a package handler, and that p.m. couriers would help Jeck only on an as-needed basis.  This is not true. After Marcotte complained and O'Sullivan took him off the reload, O'Sullivan regularly scheduled Rogers, a less senior courier, to do the reload every day with Jeck.  The only difference between Marcotte and Rogers is that Marcotte filed an internal complaint and EEOC charge of sexual harassment, while Rogers did not.

The fact that Rogers replaced Marcotte on the reload, directly contradicting O'Sullivan's testimony,  and O'Sullivan's comments exposing her retaliatory motive, particularly her statement to Hill that she wanted to "get" Marcotte, show that Marcotte becoming a full time courier was nothing more than a convenient, concocted excuse O'Sullivan used to explain her decision to cut Marcotte's hours.

### B.        FedEx Subjected Marcotte to Retaliatory Harassment

Retaliatory harassment can constitute an adverse employment action if it is sufficiently severe or pervasive as to alter an employee's terms or conditions of employment.  *Walker v. Mueller Indus., Inc.*, 408 F.3d 328, 333 (7th Cir. 2005); *Knox .v State of Indiana*, 93 F.3d 1327, 1334-35 (7th Cir. 1996) (holding that insulting and demeaning comments from co-workers could constitute an adverse action).  After Marcotte filed his written complaint and EEOC charge,

O'Sullivan, McGill, and Carrell created a hostile work environment for Marcotte in retaliation for his complaints.

Shortly after submitting his March 2003 written complaint, O'Sullivan assigned McGill to work the reload with Marcotte to retaliate against him for complaining.  McGill had not worked the reload since Marcotte and Jeck started doing the reload together.  Not surprisingly, Marcotte was extremely uncomfortable working with McGill that night.  McGill glared at him throughout the evening and threw small packages at him.  If Jeck was unavailable that night, O'Sullivan could have assigned any of the station's approximately 30 other couriers to help Marcotte with the reload.  Instead, she chose the one person who Marcotte had just complained about sexually harassing him.  In light of O'Sullivan's post-complaint behavior towards and statements about Marcotte, the most logical explanation for why O'Sullivan assigned McGill, rather than any other courier, to help Marcotte with the reload within days of him complaining about McGill was to retaliate against him.

In addition to harassing Marcotte by assigning McGill to work with Marcotte within days of his complaint, O'Sullivan engaged in retaliatory harassment by making the comments outlined in the previous section to Marcotte and Hill that showed her desire to get back at Marcotte.[5] O'Sullivan also treated Marcotte differently after his complaint by failing to answer his questions, being short with him, and refusing to communicate with him.

After Marcotte complained to O'Sullivan about the DADS messages McGill was sending him, and continuing to the end of McGill's employment, McGill's harassment turned from sexual to retaliatory.  He frequently threw letters in Marcotte's truck, tipped the trash can over in

---

[5] Although Marcotte did not personally hear O'Sullivan's comments to Hill,  second-hand comments are relevant in determining whether Marcotte was subjected to retaliatory harassment. *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2nd Cir. 1997); *Hirase-Doi v. U.S. West. Comms, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995).

his truck, spilled supplies in his truck, threw letters or packages at Marcotte, glared at him, or threw packages on the floor, which Marcotte had to pick up.  The intensity of this harassment escalated during approximately the last month of McGill's employment, when Carrell had assigned McGill to work directly next to Marcotte, until McGill committed battery against Marcotte by pushing a heavy machine into Marcotte's head.

McGill had ample opportunity to harass Marcotte during the last month of McGill's employment because Carrell assigned McGill to work directly next to Marcotte every morning. This decision, which was about the only thing Carrell could do to make the situation between McGill and Marcotte worse, was retaliatory.  Carrell knew about McGill's history of harassing McGill.  Marcotte told Carrell that the harassment was ongoing, that McGill was dangerous, and that he wanted McGill to stay away from him.  Carrell's hostile, aggressive comments to Marcotte, particularly his warning to Marcotte that he was the "biggest, baddest motherfucker," that if he did not like what he saw he would "kick the shit" out of him, and that nobody "fucks" with him and Muftic, along with the fact that the only response he had to Marcotte's complaint was to do exactly the opposite of what Marcotte asked, are evidence that Carrell is antagonistic towards and targets complainers.  Indeed, Carrell's decision to assign McGill to work next to Marcotte, after Marcotte complained about him, told him he thought McGill was dangerous, and asked to stay away from him, seems truly vindictive and malicious.

Carrell claims that he assigned Marcotte and McGill to work next to each other for operational efficiency reasons and that he could not have maintained the same efficiency by assigning somebody else to the splitter position because of seniority.  Blind adherence to seniority, however, does not justify Carrell completely ignoring McGill's past and ongoing harassment and assigning him to work four feet away from Marcotte every morning.  FedEx had

14

a legal obligation to stop known sexual and retaliatory harassment.  FedEx had no similar
obligation to respect McGill's seniority when giving him work assignments.   Ironically, FedEx
had no compunction about ignoring seniority obligations when assigning a less senior courier
than Marcotte to replace him on the reload.

      In addition to assigning McGill to work four feet from Marcotte every day, Carrell also
subjected Marcotte to excessive scrutiny.  He called Marcotte into his office far more than
Marcotte's co-workers to sign or initial paperwork regarding various minor mistakes Marcotte
made, and far more than O'Sullivan ever did prior to his written complaint and EEOC charges.

      The harassing actions of O'Sullivan, McGill, and Carrell, taken as a whole, were
sufficiently severe or pervasive to constitute a hostile work environment.  After Marcotte's
written complaint, McGill harassed Marcotte a couple of times a week for approximately nine
months by, among other things, throwing letters in his truck, throwing letters and boxes at him,
glaring at him, and blowing kisses at him.   O'Sullivan and Carrell aided McGill's efforts to
harass Marcotte by assigning McGill to work with Marcotte in retaliation for his complaints
about McGill.  On top of McGill's harassment, Marcotte had to endure hostile treatment from
both O'Sullivan and Carrell.  This consistent, pervasive pattern of harassment clearly rose to the
level of a hostile work environment.

      FedEx should be held liable for the retaliatory harassment because it had notice of the
harassment, but did nothing to stop it.  *Knox*, 93 F.2d at 1335 (upholding verdict against
employer that "[sat] on its hand in the face of [a] campaign of co-worker harassment").  On June
16, 2003,  and July 17, 2003, Marcotte complained to Smith about O'Sullivan.  In July 2003,
Smith began an investigation, during which Hill reported to her the hostile comments she heard
O'Sullivan make about Marcotte.  FedEx did not bother to discuss with O'Sullivan the evidence

it obtained in the investigation, much less discipline her for any of her retaliatory actions.  In August 2003, and in September 2003, Marcotte complained to O'Sullivan and Carrell, respectively, about McGill harassing him, but nothing was done.  On October 1, 2003,  Marcotte called Smith and complained to her again that McGill was still harassing him.  Smith's incredible response to Marcotte was that FedEx had done a complete investigation, the issue was resolved, and he should "grow up and act like a man."  Smith apparently believed that her job ended at investigating harassment, regardless of whether the action FedEx took after the investigation was effective in ending the harassment.  FedEx had multiple opportunities to put a stop to the retaliatory harassment and utterly failed at every opportunity.

### C.       FedEx Terminated Marcotte In Retaliation for His Harassment Complaints

FedEx's Acceptable Conduct policy provides that a third disciplinary notification in a twelve month period will normally result in termination. EEOC, however, will show that FedEx in fact terminated Marcotte in retaliation for his sexual harassment complaints and that its purported reasons for doing so were pretextual because FedEx failed to follow its Acceptable Conduct policy with respect to similarly situated employees.

The third warning letter Marcotte received, which led to his termination, was for driving without his seat belt on and the driver's side door of his vehicle open, a policy violation which Nave has regularly committed without consequence.  Kerouac will testify that he has witnessed Nave drive with his seatbelt off and driver's side door open more than 50 times, including around the time Marcotte was suspended, and has not once issued Nave any type of discipline. Carrell's selective enforcement of FedEx's safety policy, along with his harassment of Marcotte as outlined above, reveals the true motivation behind Carrell's decision to enforce the policy against Marcotte, a decision which ultimately cost Marcotte his job.

16

Similarly, FedEx selectively applied its "three strikes" policy to Marcotte.  FedEx completely ignored its Acceptable Conduct policy when McGill received his third warning *for sexually harassing Marcotte*, but followed it to the letter when Marcotte received his third warning, for violating a safety rule that others routinely ignore.  According to FedEx's Acceptable Conduct policy, when a third reminder or warning letter is entered in FedEx's PRISM system, a notification will be sent to the employee's senior manager, managing director, and human resources representative.  The policy further provides that if the company elects not to terminate the employee, the manager must provide a written explanation as to why the employee was not terminated, which is to be maintained in the employee's station file and sent to the human resources manager.  Additionally, according to Rodriguez, any exception to the policy of terminating employees after receiving three reminder or warning letters in a twelve month period has to be approved by Al Shenouda, the human resources manager.  FedEx did not follow any of these steps and never even considered terminating McGill.  No manager provided a written memorandum explaining why McGill should not be fired, as required by FedEx's policy, and FedEx was unable to provide any justification for why McGill was not terminated in June 2003.

Because the evidence will show that FedEx strictly applied its Acceptable Conduct policy to Marcotte but utterly ignored it when it came to McGill and Nave, EEOC will be able to prove that the actual motivation behind FedEx's decision to terminate Marcotte was retaliatory.

## III.    AN AWARD OF PUNITIVE DAMAGES AGAINST FEDEX IS APPROPRIATE

Title 42 U.S.C. § 1981a(b)(1) provides for punitive damage awards in cases of intentional discrimination:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision)

if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

*Kolstad v. American Dental Assoc.*, 527 U.S. 526, 534 (1999). The terms "malice" or "reckless indifference" refer to the actor's state of mind. *Id.* at 535. Although egregious misconduct is evidence of the requisite mental state, "the statute does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind." *Id.*

*Kolstad* established a three-part framework for determining whether punitive damages are appropriate under Section 1981a. *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Bruso v. United Air Lines, Inc.,* 239 F.3d 848, 857 (7th Cir.2001); *Ciesielski v. Hooters Management Corp.*, No. 03 C 1175, 2004 WL 2997648, *1 (N.D. Ill. Dec. 27, 2004). First, a plaintiff must demonstrate that the defendant acted with knowledge that its actions may have violated federal law. *Kolstad,* 527 U.S. at 536; *Bruso,* 239 F.3d at 857. A plaintiff can establish this requirement by demonstrating that the relevant employees knew or were familiar with anti-discrimination laws and the employer's anti-discrimination policies. *Bruso,* 239 F.3d at 858. Here, the evidence will show that FedEx managers, including O'Sullivan, Carrel, and Smith, were indeed familiar with the anti-discrimination laws and the company's policies.

Second, the plaintiff must establish a basis for imputing liability to the employer. *Kolstad,* 527 U.S. at 539. A plaintiff establishes this element by showing that the employees who discriminated against him were managerial agents acting within the scope of their employment. *Id.; Bruso,* 239 F.3d at 858. Whether an employee acts in a managerial capacity is a fact-intensive inquiry based on the authority the employer gives the employee, the employee's discretion, and the manner in which the employee carries out his duties. *Kolstad,* 527 U.S. at

543.  Such an employee must be "important," but need not be top management or the company's
officers or directors. *Id.* Here, the evidence at trial will show that several persons serving in
managerial capacities engaged in discrimination while acting in the scope of their employment.
As described *supra*, Pam O'Sullivan, Marcotte's direct supervisor, repeatedly ignored his
complaints of sexual harassment over a period of years (and those of Kerouac) and then engaged
in a campaign of retaliation after his written complaint and EEOC charge.  Moreover, Smith, the
senior member of the FedEx HR department heading the investigation into Marcotte's
complaints of sexual harassment, told Marcotte that she was tired of hearing about his
complaints, that the investigation was completed, the problem was solved, and he should "grow
up and act like a man."

Finally, an employer may avoid liability for punitive damages if it can establish that it
engaged in a good faith effort to implement an anti-discrimination policy. *See id.* at 544-45;
*Bruso,* 239 F.3d at 858. The existence of an anti-discrimination policy alone, however, is
insufficient to fulfill this requirement. *Bruso,* 239 F.3d at 858-59. The employer must also
engage in good faith efforts to comply with Title VII after it becomes aware of any
discrimination complaints. *See Lamply v. Onyx Acceptance Corp.,* 340 F.3d 478, 483 (7th Cir.
2003). This requirement exists so that employers do not insulate themselves from punitive
damages by simply implementing anti-discrimination policies without actually enforcing them.
*See Bruso,* 239 F.3d at 858-59; *Ciesielski,* 2004 WL 2997648 at *2.  Here, the evidence at trial
will overwhelmingly show that, while FedEx had an anti-discrimination policy on paper, it failed
to implement its policy, and it clearly failed to engage in good faith efforts to comply with the
law after it became aware of complaints.

The evidence will easily support a finding that FedEx acted with malice or reckless

indifference to the federally protected rights of Marcotte and Kerouac, warranting an award of punitive damages.

## **CONCLUSION**

The record is clear that Marcotte and Kerouac endured years of severe, constant sexual harassment by a coworker, that FedEx management knew for years about the harassment and its severity, and that FedEx did nothing to stop it. Even after FedEx's human resources department received a written complaint from Marcotte and conducted an investigation into his complaints, FedEx was completely ineffective in either stopping the harassment or protecting Marcotte from retaliation by his managers. A finding of liability and an award of compensatory and punitive damages are appropriate here.


Respectfully submitted,

| | |
|---|---|
| _____s/Ann M. Henry_____ | _____s/Jeanne B. Szromba_____ |
| Ann M. Henry | Jeanne B. Szromba |
| ARDC # 6272394 | ARDC # 6207846 |
| EEOC | EEOC |
| 500 West Madison Street, Suite 2800 | 500 West Madison Street, Suite 2800 |
| Chicago, Illinois 60661 | Chicago, Illinois 60661 |
| Telephone: (312) 353-8558 | Telephone: (312) 353-7546 |
| Fax: (312) 353-8555 | Fax: (312) 353-8555 |
| E-Mail: ann.henry@eeoc.gov | E-Mail: Jeanne.szromba@eeoc.gov |
| | |
| Attorney for Plaintiff | Attorney for Plaintiff |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2007, I electronically filed the foregoing **Final Pretrial Order** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jay L. Grytdahl, Esq.
ARDC# 6271036
Senior Attorney, Litigation
Federal Express Coproation
3620 Hacks Cross Road
3rd Floor – Building B
Memphis, TN 38125
Telephone:  (901) 434-8590
Fax: (901) 434-9278
E-Mail: jlgrytdahl@fedex.com

 _s/ Jeanne B. Szromba_____
Jeanne B. Szromba, Esq.
ARDC# 6207846
EQUAL EMPLOYMENT OPPORTUNITY
 COMMISSION
Chicago District Office
500 West Madison Street
Suite 2800
Chicago, Illinois 60661
Telephone: (312) 353-7546
Fax: (312) 353-8555
E-Mail: jeanne.szromba@eeoc.gov

Attorney for Plaintiff